## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                     )

**PROJECT ON GOVERNMENT**        )
**OVERSIGHT, INC.**                      )
**1100 G St NW**                          )
**Suite 500**                             )
**Washington, D.C. 20005,**       )
                                       )
        **Plaintiff,**                )
                                       )
**v.**                                     )       **Case No: 18-2990**
                                       )
**U.S. DEPARTMENT OF JUSTICE**    )
**NATIONAL SECURITY DIVISION**   )
**Room 6150**                          )
**950 PENNSYLVANIA AVE., NW**    )
**WASHINGTON, DC 20530-0001**    )
                                       )
        **Defendant.**             )
_____)

## COMPLAINT

Plaintiff, Project On Government Oversight ("POGO"), brings this action against the

Defendant, U.S. Department of Justice, National Security Division ("NSD") under the Freedom

of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C.

§§ 2201 and 2202, seeking declaratory and injunctive relief to compel compliance with the

requirements of FOIA, including immediate release of records requested by POGO.

### I.       INTRODUCTION

1.       POGO asserts violations of FOIA by NSD for failing to provide responsive

documents concerning leaks and unauthorized disclosure of information from government

agencies, entities and offices from January 2007 to the present.

2.       POGO filed a request with NSD regarding this subject on June 12, 2018.

3.       NSD acknowledged receipt of POGO's request on June 16, 2018.

4.       FOIA requires NSD to respond within 20 business days, excluding Saturdays, Sundays, and legal holidays. To date, NSD has not produced any responsive documents.

5.       POGO seeks a declaration that NSD violated FOIA by failing to disclose responsive records by the statutory deadline and an injunction ordering NSD to produce all non-exempt, responsive records by a date certain, without further delay.

## II.       JURISDICTION AND VENUE

6.       This Court has both subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## III.       PARTIES

7.       Plaintiff POGO is a nonpartisan independent organization based in Washington, DC organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. POGO's investigators and journalists take leads and information from insiders and verify the information through investigations using FOIA, interviews, and other fact-finding strategies. POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, the Robert D.G. Lewis Watchdog Award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. POGO extensively used records obtained under FOIA for this investigation.

8.     Defendant NSD is a division of the U.S. Department of Justice ("DOJ"), a federal agency within the meaning of FOIA, 5 U.S.C. § 552(f)(1), and headquartered in Washington, DC. NSD has possession, custody, and control of the records POGO seeks in this action.

## IV.     FREEDOM OF INFORMATION ACT

9.     FOIA requires federal agencies, upon request, to make records "promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

10.     The agency must provide the public records when they are requested by the public, in order "to ensure an informed citizenry, vital to the functioning democratic society." *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

11.     An agency must determine whether to comply with a FOIA request within twenty business days and "shall immediately notify the person making such request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i); *see also* 15 C.F.R. § 4.6(b).

12.     The twenty-day deadline for an agency to determine whether to comply with a request begins on the earlier of: l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

13.     In unusual circumstances, the time limits prescribed may be extended by written notice to the person making such request setting forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

14.     If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. Id. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

## V.     BACKGROUND AND PUBLIC INTEREST IN THE RECORDS SOUGHT

### i.     National Security Division

15.     NSD, a division of the DOJ, was created in March 2006 by the USA PATRIOT Reauthorization and Improvement Act (Pub. L. No. 109-177).

16.     The NSD consolidated the national security components of the Department of Justice under a new Assistant Attorney General ("AAG for National Security").

17.     The creation of the NSD consolidated DOJ's primary national security operations: the former Office of Intelligence Policy and Review; and the Counterterrorism and Counterintelligence and Export Control Sections of the Criminal Division. The Office of Law and Policy and the Executive Office, as well as the Office of Justice for Victims of Overseas Terrorism (which previously operated out of the Criminal Division) complete the NSD.

18.     The AAG for National Security acts as the Department's liaison with the Office of the Director of National Intelligence, the Central Intelligence Agency, the Department of Defense, and other intelligence community agencies in order to improve coordination against terrorism and other threats to national security.

19.     The mission of the National Security Division is to protect the United States from threats to national security by pursuing justice through the law.

## ii.      President Trump Repeatedly Complains About Leaks

20.      On a number of occasions, President Trump has publicly complained about disclosures to the press, many of which he has asserted are illegal. The following are some of those communications.

> February 14, 2017: *The real story here is why are there so many illegal leaks coming out of Washington? Will these leaks be happening as I deal on N.Korea etc?*
> https://twitter.com/realdonaldtrump/status/831510532318429184

> February 15, 2017: *Information is being illegally given to the failing @nytimes & @washingtonpost by the intelligence community (NSA and FBI?).Just like Russia*
> https://twitter.com/realdonaldtrump/status/831840306161123328

> February 16, 2017: *Leaking, and even illegal classified leaking, has been a big problem in Washington for years. Failing @nytimes (and others) must apologize!*
> https://twitter.com/realdonaldtrump/status/832197515248275456

> February 16, 2017: *The spotlight has finally been put on the low-life leakers! They will be caught!*
> https://twitter.com/realdonaldtrump/status/832198588201594880

> February 24, 2017: *The FBI is totally unable to stop the national security "leakers" that have permeated our government for a long time. They can't even......*
> https://twitter.com/realdonaldtrump/status/835104946034991106

> February 24, 2017: *find the leakers within the FBI itself. Classified information is being given to media that could have a devastating effect on U.S. FIND NOW*
> https://twitter.com/realdonaldtrump/status/835106143462703104

> February 26, 2017: *Russia talk is FAKE NEWS put out by the Dems, and played up by the media, in order to mask the big election defeat and the illegal leaks!*
> https://twitter.com/realdonaldtrump/status/835916511944523777

> June 11, 2017: *I believe the James Comey leaks will be far more prevalent than anyone ever thought possible. Totally illegal? Very 'cowardly!'*
> https://twitter.com/realdonaldtrump/status/873879934040780801

July 22, 2017: *While all agree the U. S. President has the complete power to pardon, why think of that when only crime so far is LEAKS against us.FAKE NEWS*
https://twitter.com/realdonaldtrump/status/888724194820857857

July 22, 2017: *A new INTELLIGENCE LEAK from the Amazon Washington Post,this time against A.G. Jeff Sessions.These illegal leaks, like Comey's, must stop!*
https://twitter.com/realdonaldtrump/status/888708453560184832

### iii. DOJ and Attorney General Sessions Addresses Leak Investigations

21.     In an August 2017 DOJ press release, Attorney General Jeff Sessions explained that the DOJ has, "tripled the number of active leak investigations," "the Department is reviewing policies that impact leak investigations," "For the past several months, we have already made changes and are seriously ramping up our efforts," and "Soon after I arrived here in February, I initiated a review of our leak investigations and prosecutions. I reviewed how these cases were being referred and handled and was concerned with what we found." *See* August 4, 2017 DOJ Press Release, attached hereto as Exhibit A, p. 2.

### iv. President Trump Praises Attorney General Sessions and Continues to Raise the Issue of Leaks

22.     President Trump continued to raise the issue of unauthorized disclosures and national security.

August 5, 2017: *After many years of LEAKS going on in Washington, it is great to see the A.G. taking action! For National Security, the tougher the better!*

https://twitter.com/realdonaldtrump/status/893969438139191296

April 27, 2018: *Is everybody believing what is going on. James Comey can't define what a leak is. He illegally leaked CLASSIFIED INFORMATION but doesn't understand what he did or how serious it is. He lied all over the place to cover it up. He's either very sick or very dumb. Remember sailor!*

https://twitter.com/realdonaldtrump/status/989813047773614080

May 1, 2018: *So disgraceful that the questions concerning the Russian Witch Hunt were "leaked" to the media. No questions on Collusion. Oh, I see...you have a made up, phony crime, Collusion, that never existed, and an investigation begun with illegally leaked classified information. Nice!*

https://twitter.com/realdonaldtrump/status/991267863674675200

May 14, 2018: *The so-called leaks coming out of the White House are a massive over  exaggeration put out by the Fake News Media in order to make us look as bad as possible. With that being said, leakers are traitors and cowards, and we will find out who they are!*

https://twitter.com/realdonaldtrump/status/996129630913482755?lang=en

August 24, 2018: *"Department of Justice will not be improperly influenced by political considerations." Jeff, this is GREAT, what everyone wants, so look into all of the corruption on the "other side" including deleted Emails, Comey lies & leaks, Mueller conflicts, McCabe, Strzok, Page, Ohr......*

https://twitter.com/realdonaldtrump/status/1032934937962442754

### v.   Former Senate Employee Indicted For False Statements Related to Release of "Controlled Information"

23.     On June 7, 2018, the DOJ indicted James A. Wolfe, a former staffer of the Senate

Intelligence Committee, on charges of making false statements to the FBI during a leak

investigation that begun "in or around 2017." The Justice Department press release mentioned it

is prioritizing the investigation and prosecution of unauthorized release of a broader array of

information than classified information:

> "The Attorney General has stated that investigations and prosecutions of unauthorized disclosure of controlled information are a priority of the Department of Justice.  The allegations in this indictment are doubly troubling as the false statements concern the unauthorized disclosure of sensitive and confidential information," said Assistant Attorney General Demers.
>
> https://www.justice.gov/usao-dc/pr/former-us-senate-employee-indicted-false-statements-charges

24.     The indictment against Wolfe does not mention or explicitly define what is meant by "controlled," "sensitive," or "confidential" information – terms used in the press release. It does refer to Wolfe's false statements in relation to the release of information "that was not otherwise publicly available." (pages 10, 11:

https://www.documentcloud.org/documents/4529875-Wolfe-Indictment.html)

25.     The day after the DOJ indictment and press release became public, on June 8, 2018, President Trump said:

> It's very interesting that they caught a leaker in a very important —
> it's a very important leaker.  So it's very interesting.  I'm getting
> information on it now.  Happened last night.  It could be a terrific
> thing.

https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-8/

26.     *The New York Times* wrote that the Justice Department "secretly seized years' worth of a New York Times reporter's phone and email records" in the investigation that snared Wolfe. The reporter is Ali Watkins, who had previously worked for Politico, Buzzfeed, and McClatchy. The Wolfe indictment refers to the Justice Department questioning him about his communications with four reporters. https://www.nytimes.com/2018/06/07/us/politics/times-reporter-phone-records-seized.html?module=inline

### vi.     The New York Times Op-Ed

27.     On September 5, 2018, *The New York Times* published an anonymous Op-Ed written by, "a senior official in the Trump administration," entitled "I am Part of the Resistance Inside the Trump Administration." *See* September 5, 2018 *The New York Times* article, attached here to as Exhibit B.

28.    The article focused on an alleged effort among some of the President's senior advisors to "keep bad decisions contained to the West Wing, though they are clearly not always successful."

> 'There is literally no telling whether he might change his mind from one minute to the next,' a top official complained to me recently, exasperated by an Oval Office meeting at which the president flip-flopped on a major policy decision he'd made only a week earlier.

Exhibit B, p. 2

29.    According to the author of the Op-Ed:

> It may be cold comfort in this chaotic era, but Americans should know that there are adults in the room. We fully recognize what is happening. And we are trying to do what's right even when Donald Trump won't.

> The result is a two-track presidency.

> Take foreign policy: In public and in private, President Trump shows a preference for autocrats and dictators, such as President Vladimir Putin of Russia and North Korea's leader, Kim Jong-un, and displays little genuine appreciation for the ties that bind us to allied, like-minded nations.

> Astute observers have noted, though, that the rest of the administration is operating on another track, one where countries like Russia are called out for meddling and punished accordingly, and where allies around the world are engaged as peers rather than ridiculed as rivals.

> On Russia, for instance, the president was reluctant to expel so many of Mr. Putin's spies as punishment for the poisoning of a former Russian spy in Britain. He complained for weeks about senior staff members letting him get boxed into further confrontation with Russia, and he expressed frustration that the United States continued to impose sanctions on the country for its malign behavior. But his national security team knew better — such actions had to be taken, to hold Moscow accountable.

Exhibit B, pp. 2-3.

### vii.      The White House's Response

30.      On Friday, September 7, President Trump requested that DOJ investigate the

author of the September 5 *New York Times* op-ed, based on a potential national security risk

caused by the author of the article.

31.      The *Washington Post* published an article that addressed the President's response

to the op-ed, entitled, "Trump Says Justice Department Should Investigate Anonymous Op-Ed

Author."  In this article the President was quoted as saying:

> 'We're going to take a look at what he had, what he gave, what
> he's talking about, also where he is right now'…if the anonymous
> author has a high-level security clearance, the president
> emphasized, 'and he goes into a high-level meeting concerning
> China or Russia or North Korea or something, I don't want him in
> those meetings.'

*See* September 7, 2018 *Washington Post* article, attached here to as Exhibit C, p. 1.

32.      According to the *Washington Post* article:

> Trump's comment Friday that Attorney General Jeff Sessions
> should investigate who wrote the newspaper op-ed isn't the first
> time he has demanded that the FBI or Justice Department look into
> a disclosure that is embarrassing to the White House.
>
> In the early days of the administration, the president and some of
> his aides repeatedly pressed then-FBI Director James B. Comey
> and other law enforcement officials to investigate not just leaks of
> classified information but also disclosures of unclassified,
> nonsensitive information, according to people familiar with the
> discussions.
>
> Federal law enforcement officials have responded privately to such
> requests in the past by explaining an important distinction:
> Disclosing classified information can be a crime worthy of
> investigation; disclosing nonprotected information usually is not a
> crime, and therefore would not be investigated by federal agents.

Exhibit C, p. 3.

### viii.    WikiLeaks

33.    On November 15, the *Washington Post* published an article concerning

WikiLeaks founder Julian Assange having been charged under seal in relation to leaking

classified and sensitive government information. *See* November 15, 2018, *Washington Post*

article, attached here to as Exhibit D.

34.    According to the article, "the Trump administration, had begun taking a second

look at whether to charge members of the WikiLeaks organization for the 2010 leak of

diplomatic cables and military documents that the anti-secrecy group published. Investigators

also had explored whether WikiLeaks could face criminal liability for the more recent revelation

of sensitive CIA cybertools." Exhibit D, p. 1.

### ix.  Public Interest

35.    The records POGO requested concern the operations of the federal government.

They concern the Justice Department and other agencies' efforts to investigate and combat

unauthorized releases of information.

36.    POGO seeks details on the last decade of the Justice Department's efforts to

investigate unauthorized releases of information. Some similar information was released for the

period prior to 2007. This information would cover the decade since. It would also provide more

detail about DOJ's efforts beyond public statements by Justice Department and other government

officials.

37.    The records would be likely to contribute to public understanding of what the

Justice Department and other agencies are doing to investigate unauthorized disclosures, the

challenges these cases pose both practically but also balanced against other interests such as the

First Amendment rights of individuals and the news media.

38.     The records would be a significant contribution because most of this information

is not public and little is known despite the importance and potential impacts of these Justice

Department activities. Some information previously provided on a proactive basis has not been

made public recently, such as the 2016 and 2017 annual reports on "Department of Justice Use

of Certain Law Enforcement Tools to Obtain Information from, or Records of, Members of the

News Media; and Questioning, Arresting, or Charging Members of the News Media."

39.     The requested records may shed significant light on statements by Attorney

General Jeff Sessions in the August 2017 DOJ press release.

40.     Additionally, the records will reveal new developments and new data in the

almost-year since the Attorney General made those remarks.

## VI.     PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUEST

41.     On June 12, 2018, POGO employee Nick Schwellenbach submitted a FOIA

request via electronic mail to NSD which requested:

> 1.     Tracking Reports, any other tracking or statistical
> information on referrals from agencies and government sources,
> crime reports sent, investigations, prosecutions, and other actions
> related to leaks/unauthorized disclosures of information maintained
> and/or compiled by the National Security Division since January
> 2007 - also please provide any data dictionary, code sheets, or
> other documentation for users detailing the meaning of fields,
> acronyms, etc. Please provide all field headers in the tracking
> system even if some of the content in the fields is redacted (see this
> link and this link for examples of leak investigation data in an
> Automated Case Tracking System provided under FOIA
> previously).
>
> 2.     All National Security Division closure letters sent
> regarding leak investigation since January 2007 (see this link for
> an example of such a letter provided under FOIA).
>
> 3.     Any email correspondence Assistant Attorney General John
> Demers and any individuals with who.eop.gov, mail.house.gov, or
> senate.gov email addresses regarding "leaks", "unauthorized

disclosures", "insider threat", "whistleblowers", "whistleblowing", "Comey", and "McCabe".

4.      Any minutes by Task Forces, Working Groups, Subcommittees, and other Justice Department-convened meetings, including those with the News Media Dialogue Group, regarding "insider threats", "leaks", or "unauthorized disclosures" since January 2007 (see this link for an example of minutes provided under FOIA previously).

5.      Any recommendations, analysis, presentation, memo, guidance, and reports—including drafts of the aforementioned—regarding the "Eleven Questions" that are used to assess whether to launch a leak investigation since January 2007 (see this link for an example of a recommendation provided under FOIA previously).

6.      Any recommendations, analysis, presentation, memo, guidance, and reports—including drafts of the aforementioned—regarding leak-related investigations, prosecutions, and sentencing as well as compelling testimony and seeking records from and about journalists and news organizations generally since January 2007.

7.      Any recommendations, analysis, presentation, memo, guidance, and reports—including drafts of the aforementioned—regarding investigating or prosecuting "controlled information", "controlled unclassified information", "law enforcement sensitive", "Privacy Act," or any other form of non-classified, non-public information leaked to the media since January 2007.

8.      Any recommendations, analysis, presentation, memo, guidance, and reports—including drafts of the aforementioned—mentioning "Signal", "Whatsapp", "Secure Drop", "Proton Mail", "Telegram", and "Confide" since January 2007.

9.      All annual reports detailing "Department of Justice Use of Certain Law Enforcement Tools to Obtain Information from, or Records of, Members of the News Media; and Questioning, Arresting, or Charging Members of the News Media" and any other records detailing statistics or tracking information related to subpoenas, including national security letters (also known as exigent letters), for records about members of the media and regarding other non-government sources related to leak investigations, including approvals and denials of subpoenas, since January 2007 (see the 2014 and 2015 reports and this link as an example of such data provided under FOIA previously).

10.     Any statistical or other records relating to administrative actions taken against federal employees, contractors, and uniformed military personnel related to leaks to the media since January 2007.

11.     Any proposed legislative language, technical remarks on proposed legislation, and other input on legal authorities current or proposed regarding leaks/unauthorized disclosures since January 2007.

12.     Any proposed revisions to the Department's "Policy Regarding Obtaining Information From, Or Records Of, Members Of The News Media; And Regarding Questioning, Arresting, Or Charging Member Of The News Media."

13.     Any records memorializing consultation with the Policy and Statutory Enforcement Unit of the Criminal Division's Office of Enforcement Operations related to leak investigations or other investigations involving the media.

14.     Any records requesting the Attorney General's (or designee) authorization to subpoena members of the news media since January 2007.

15.     Any email correspondence Assistant Attorney General John Demers had with individuals in DOJ Office of Public Affairs regarding Reality Winner, Ali Watkins, James Wolfe, leak investigations, media-related subpoenas, or the news media guidance (referred to above as "Policy Regarding Obtaining Information From, Or Records Of, Members Of The News Media; And Regarding Questioning, Arresting, Or Charging Member Of The News Media").

16.     Any guidelines, rules, policies, and proposed revisions or changes involving the aforementioned for using National Security Letters and so-called informal "exigent letters."

*See* NSD FOIA Request ("Request"), attached hereto as Exhibit E, pp. 1-2.

42.     On July 16, 2018, POGO received an acknowledgment letter for the Request and it was assigned the reference number FOIA/PA #18-229.

43.     NSD's acknowledgment letter stated:

> Our policy is to process FOIA requests on a first-in, first-out basis. Consistent with this policy, every effort will be made to respond to your request as quickly as possible. The actual processing time will depend upon the complexity of the request, whether it involves sensitive or voluminous records, and whether consultations with other agencies or agency components are appropriate.

*See* July 16, 2018 Acknowledgment letter, ("Acknowledgment") attached hereto as Exhibit F, p. 2.

44. On November 8, 2018, in response to POGO's November 7, 2018 status update request POGO was informed that "[NSD] is still conducting a search for possible responsive documents to [POGO's] request." *See* November 2018 emails attached hereto as Exhibit G.

45. To date, POGO has received no documents responsive to the Request.

46. More than 30 business days have passed since the Request was acknowledged and NSD has provided no further update on the status of this request.[1]

47. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for NSD's failure to disclose them.

## VII.   CAUSES OF ACTION

### COUNT 1
### Violation of the FOIA for Failure to make Promptly
### Available the Records Sought by Plaintiff's Request

48. Paragraphs 1-47 are re-alleged and reincorporated herein by reference.

49. Plaintiff properly requested records within the possession, custody, and control of Defendants.

50. Defendant's Failure to make promptly available the records sought by Plaintiff's request violates the FOIA, 5 U.S.C. § 552(a)(3)(A).

---

[1] FOIA allows the Agency 20 business days to respond to POGO's request. An Agency also has to right to requested and additional 10 days to respond. NSD has failed to do so.

## COUNT 2
### Violation of the FOIA for Failure to
### Timely Respond to Plaintiff's Request

51.     Paragraphs 1-50 are re-alleged and reincorporated herein by reference.

52.     Plaintiff properly requested records within the possession, custody, and control of Defendants.

53.     Defendant's failure to respond timely to Plaintiff's request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and DOJ's own regulation promulgated thereunder, 28 C.F.R. § 16.5(a).

## VIII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, POGO, prays for the following relief:

a.  As to Count 1:
    i.   Order Defendant to immediately state which records it intends to disclose in response to Plaintiff's FOIA request;
    ii.  Order Defendant to provide a schedule of production to Plaintiff;
    iii. Order Defendant to disclose all responsive, non-exempt records by a date certain without further delay;
    iv.  Order Defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;
    v.   Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;
    vi.  Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and
    vii. Grant such other relief as the Court may deem just and proper.

b.  As to Count 2:
    i.   Order Defendant to immediately state which records it intends to disclose in response to Plaintiff's FOIA request;
    ii.  Order Defendant to provide a schedule of production to Plaintiff;
    iii. Order Defendant to disclose all responsive, non-exempt records by a date certain without further delay;
    iv.  Order Defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;
    v.   Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;
    vi.  Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and

vii. Grant such other relief as the Court may deem just and proper.

Respectfully submitted this 18th day of December, 2018.

By:      /s/Ross A. Nabatoff_____
         Ross A. Nabatoff, DC Bar # 376665
         LAW OFFICE OF ROSS A. NABATOFF
         1440 G Street, N.W.
         Washington, D.C.  20005
         (202) 650-0037
         *Attorney for Plaintiff*